**LOCAL 589, INTERNATIONAL LADIES' GARMENT WORKERS' UNION, AFL–CIO, Appellee,**

v.

**KELLWOOD COMPANY, Appellant.**

No. 78–1497.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 14, 1978.

Decided Feb. 20, 1979.

S. Richard Pincus (on brief), of Fox & Grove, Chicago, Ill., argued, for appellant; and Jeffrey A. Colby, Chicago, Ill., on brief.

Lynn-Marie Crider (on brief), of Youngdahl, Larrison & Agee, Little Rock, Ark., argued, for appellee; and James E. Youngdahl, Little Rock, Ark., on brief.

Before BRIGHT and HENLEY, Circuit Judges, and HARPER, Senior District Judge.[*]

BRIGHT, Circuit Judge.

The Union[1] brought this action under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1976), to compel the defendant-employer, Kellwood Company (Company), to arbitrate a controversy over pension benefits which the Union asserts ought to be paid to two former employees of the Company. The district court[2] granted summary judgment for the Union, determining the dispute to be arbitrable. The Company appeals. We affirm.

[*] ROY W. HARPER, United States Senior District Judge, Eastern District of Missouri, sitting by designation.

1. Local 589, International Ladies' Garment Workers' Union, AFL–CIO.

2. The Honorable G. Thomas Eisele, Chief Judge, United States District Court for the Eastern District of Arkansas. The district court's opinion is not reported.

## I. *Factual Background.*

The former employees, Harry Miers, born January 28, 1901, and Gladys Smith, born February 18, 1909, each began working for the Company or its predecessor many years prior to the dispute in question. The Union became the bargaining agent for the employees at the Company's plant in Little Rock, Arkansas, in 1966. The Union and the Company could not agree on a contract in that year, and the Union and most of the Company's Little Rock employees, including Smith and Miers, struck the plant on October 25, 1966. That strike ended on November 22, 1967, with the Union unable to enforce its demands and directing its members to return to work with the Company.

The Company refused immediate reinstatement to the strikers but offered to hire them, with the status of new employees, as positions opened up in the plant. During the next year the Company rehired both Smith and Miers, not for their former positions, but rather to lower-paying jobs. Miers quit his new job at the Company after four days' employment. Smith worked at her new job from February 1, 1968, until she quit on March 23, 1970.

Subsequent to the termination of the strike, the National Labor Relations Board (Board) found that the Company had committed numerous unfair labor practices during the 1966 contract negotiations and the strike. The Board ordered the Company to bargain with the Union and to reinstate all striking employees, whom it deemed as unfair labor practice strikers, to their pre-strike jobs. *Kellwood Company, Ottenheimer Division*, 178 NLRB 20, 49–51 (1969). This court enforced the Board's order on November 25, 1970. *Kellwood Co. v. NLRB*, 434 F.2d 1069 (8th Cir. 1970), *cert. denied*, 401 U.S. 1009, 91 S.Ct. 1257, 28 L.Ed.2d 544 (1971). On May 19, 1971, the Company offered Miers and Smith full reinstatement. Neither Miers nor Smith accepted that reinstatement.

On November 1, 1968, the Company made its pension plan, unilaterally proposed in 1966, effective in its Little Rock plant. Under the pension plan, an "employee" who began service with the Company before the effective date of the plan became covered by the plan

> on the Effective Date, or the day thereafter, when he first meets all of the following eligibility conditions:
>
> (a) he is in the Eligible Class,
>
> (b) he . has attained his 26th birthday,
>
> (c) he has one full year of Credited Service,
>
> and, if his Service began after the Effective Date,
>
> (d) he will have at least 15 years of Service on his Normal Retirement Date (assuming continued employment).

The pension plan defines an "employee" as

> any individual in the employ of the [Company] whose *customary employment* is for more than 20 hours per week and for more than 5 months per calendar year. (Emphasis added).

Employees belong to the "eligible class" unless covered by another retirement plan maintained by the Company.

The Company and the Union entered into their first collective bargaining agreement (the 1971 agreement) on August 17, 1971. Three years later, they agreed to a second labor contract (the 1974 agreement) also for a three-year period. Both of those contracts applied to the Company's Little Rock plant, and both contained the following provision regarding pensions:

> During the life of this Agreement, the employer will maintain all pension benefits (including disability and early retirement) in effect immediately prior to the execution of this Agreement, with the improvements set forth in this Article.

In January 1976, the Company and the Board entered into a settlement agreement, under which the Company paid $1,500,000 in complete satisfaction of all backpay claims encompassed by the Board's 1969 order concerning the 1966–67 strike. From the proceeds of that settlement, Harry Mi-

ers received $5,636.69, and Gladys Smith received $4,232.26.[3]

In September 1976, the Union filed a grievance on behalf of Miers and Smith alleging that, although the settlement agreement between the Company and the Board satisfied all pension claims through the January 1976 date of that agreement, the Company's failure to make pension payments due to Miers and Smith after that date violated the Company's contract with the Union.

The Company denied any entitlement of Miers and Smith to pension benefits. According to the Company, Miers' ineligibility stems from his having quit as a Company employee nearly five months before the pension plan became effective. Although Gladys Smith worked for the Company for more than a year after the effective date of the plan, the Company contends that it reemployed Smith following the strike solely as a "new" employee and that Smith should receive no credit for her prestrike years of employment. The Union contends that Miers and Smith, as "unfair labor prac-

tice strikers," retained their status as "employees" for purposes of the pension plan until they refused the Company's offer of full reinstatement in May 1971. According to the Union, the Company's wrongful refusal to reinstate these former employees after the strike cannot deprive Miers and Smith of their rights under the pension plan.

The Union demanded arbitration of the dispute,[4] but the Company refused on the ground that it never employed either claimant under a collective bargaining agreement with the Union and, therefore, the labor contract's arbitration clause was inapplicable. The Company also contended that its January 1976 settlement with the Board bars Miers' and Smith's claims. In June 1977, the Union filed this action to compel arbitration.

## II. *Arbitrability.*

The arbitration clause of the 1974 agreement broadly provides for arbitration of all claims requiring interpretation of that con-

---

3. Both Miers and Smith signed receipts which recited:

> [the money received] represents the amount of backpay, less deductions for Social Security and Withholding tax, due me in the above-described case [Board proceeding arising out of the 1966–67 strike], and which makes me whole for any and all loss of backpay suffered as a result of the discrimination against me in this matter. I understand this payment is in full settlement of such backpay and I hereby release any and all claims I have or may have in connection with this matter.

4. The applicable labor contract provisions concerning grievance procedure and arbitration read as follows:

> * * * A "grievance" shall be defined as a claim that this Agreement has been violated or a claim which requires interpretation of this Agreement. Grievances must be submitted within fifteen (15) calendar days after the facts giving rise to the grievance became known to an authorized agent of the Union.
> * * * * * *
> *Section 1.* If the parties fail to dispose satisfactorily of [any] grievance through the Grievance Procedure, * * * the issue or issues shall be submitted to arbitration upon the written demand of either party * * *.
> * * * * * *
> *Section 4.* The arbitrator shall have no power to add to, subtract from, or otherwise

amend any of the terms of this Agreement. He shall determine only whether or not there has been a violation of this Agreement, and what remedy is appropriate if any. The decision of the arbitrator shall be based solely upon the evidence and arguments presented to him by the respective parties in the presence of each other unless otherwise agreed upon.

> *Section 5.* The function and purpose of the arbitrator is to determine disputed interpretation of terms actually found in the Agreement, or to determine facts upon which the application of the Agreement depends. Past practice of the parties in interpreting or applying terms of this Agreement can be relevant evidence, but may not be used so as to justify, or result in what is in effect a modification (whether by addition or detraction) of the written terms of this Agreement.
> * * * * * *
> *Section 7.* The decision of the arbitrator within the limits herein prescribed shall be final and binding upon the parties to the dispute.

These provisions are excerpted from articles IV and V of the 1974 agreement. Although the record is incomplete, it appears that the 1971 agreement contained substantially identical provisions.

tract which could not be resolved through the grievance procedure. The Supreme Court, in two cases in the 1960 *Steelworkers* trilogy, described the judicial function in resolving a claim for compelled arbitration under such a broadly worded arbitration clause, as follows:

The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for. [*United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 567–68, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960).]

An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage. [*United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960).]

The question raised here is whether it may be said "with positive assurance" that the Union's claim involves no question of interpretation of the 1974 agreement, so that the arbitration clause does not cover the asserted dispute.

The Union, in arguing that the dispute is arbitrable, contends that resolution of the dispute depends upon the construction of the provision, contained in both the 1971 and 1974 collective bargaining agreements, requiring the Company to "maintain all pension benefits * * * in effect immediately prior to the execution of this Agreement." Thus, in the Union's view, the arbitrable issue is whether the Company, in failing to pay benefits to Miers and Smith after January 1976, breached its contractual duty to "maintain all pension benefits * * *."

The Company, on the other hand, in effect maintains that Miers' and Smith's entitlement to pension benefits depends solely upon whether these employees qualify under the Company's 1968 pension plan, and not upon any question requiring interpretation of a collective bargaining agreement.

The Company concedes that the 1974 agreement's arbitration clause covers disputes concerning pension rights generally. It asserts, however, that Miers' and Smith's pension claims are not arbitrable because any rights of those employees are to be determined in light of conditions existing before the parties entered into a collective bargaining agreement which imposed a duty to arbitrate. The Company in addition contends that the district court erred in granting summary judgment without determining whether the former employees' claims arose "under" the contract or arose before the contract came into existence. The Company relies primarily upon *Nolde Brothers, Inc. v. Bakery & Confectionery Workers' Union*, 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), in support of its position.

We think *Nolde* supports a conclusion contrary to that sought by the Company. In *Nolde*, the union sought to compel arbitration of its claim that the employer was obligated, under a labor contract that had expired, to make severance payments to certain former employees. The Supreme Court held that the dispute was arbitrable, stating:

the parties' obligations under their arbitration clause survived contract termination when the dispute was over an obligation arguably created by the expired agreement. [*Nolde Bros. v. Bakery & Confectionery Workers' Union, supra*, 430 U.S. at 252, 97 S.Ct. at 1072.]

Under *Nolde*, whether a dispute arises or rights accrued during the effective period of a labor contract does not necessarily determine arbitrability. Rather, where the parties have agreed to arbitrate all disputes

requiring interpretation of a collective bargaining agreement, the question of arbitrability focuses upon whether the disputed obligation was arguably created by that agreement.

Here, Miers and Smith already possessed all of the pension rights to which they are now entitled, if any, prior to the initial August 1971 collective bargaining agreement. However, in the 1971 agreement, and again in the 1974 agreement, the Company assumed the additional obligation to "maintain" pension benefits "in effect immediately prior to the execution of this Agreement." The dispute here, then, concerns not only the former employees' rights prior to the execution of the agreement, but also the scope of the Company's obligation created by the 1971 and 1974 agreements. The holding in *Nolde* supports a conclusion that such a dispute is arbitrable. *See United Steelworkers of America v. Canron, Inc.*, 580 F.2d 77 (3d Cir. 1978).[5]

The arbitration clause in the 1971 and 1974 agreements, as already noted, covers all matters requiring interpretation of contractual provisions. The district court in granting summary judgment to the Union stated:

> In this case it cannot be said that the arbitration clause is not susceptible of an interpretation that covers the pension dispute, even on that set of facts stated most favorably for the defendant. The employment status of Miers and Smith in relation to the accrual of any pension rights and to the collective bargaining agreement * * * are matters to be taken up in the arbitration.

We agree with that determination. The arbitrator will be called upon to determine whether Miers and Smith possess pension rights which were "in effect immediately prior to the execution of this Agreement," as that language appears in the 1971 and 1974 collective bargaining agreements.

Many of the Company's arguments on this appeal go to the merits of this dispute, not to its arbitrability.[6] We heed the Supreme Court's admonition that the courts should not

> become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator. [*United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 585, 80 S.Ct. 1347, 1354, 4 L.Ed.2d 1409 (1960).]

Accordingly, we affirm the district court's order compelling arbitration.[7]

---

**5.** In *Canron*, the employer refused to pay insurance premiums for retirees who had worked only for the employer's predecessor. The employer resisted the Union's demand for arbitration on the ground that the arbitration clause did not cover the dispute, because the retirees were never employees under the contract. The Third Circuit held that the issue of whether the employer "did in fact *contractually* commit itself to underwrite the [insurance] premium costs for * * * the retirees" was arbitrable. *United Steelworkers v. Canron, supra*, 580 F.2d at 80, 81 (emphasis in original).

**6.** For example, the Company contends that it intended to maintain benefits only for employees covered by the collective bargaining agreements, that Miers and Smith never qualified for benefits under the 1968 pension plan, and that the former employees' claim of an employee status entitling them to benefits depends not on the provisions of the pension plan, as incorporated into the collective bargaining agreements, but rather upon national labor law.

**7.** In addition to its contentions of nonarbitrability of Miers' and Smith's pension claims, the Company asserts as an affirmative defense that the January 1976 settlement with the NLRB bars the former employees' claims. The district court left that issue to the arbitrator without ruling on the merits of that affirmative defense.

The Company has not separately raised on this appeal the issue of whether its affirmative defense is subject to arbitration. As that issue is not before us, we express no opinion on its merits.

However, we note that, on its face, the Company's affirmative defense arises out of the unfair labor practice proceedings before the Board, rather than from the collective bargaining agreement. On the other hand, the context of the Board settlement may be inextricably intertwined with the merits of the Union's claims. Should the arbitrator reach the Company's affirmative defense, he may determine that the effect of the settlement is not arbitrable and leave that issue for disposition in an

appropriate forum. *Cf. Northwest Airlines, Inc. v. Air Line Pilots Ass'n*, 442 F.2d 251, 255 (8th Cir. 1971).